## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY DUNLAP,<br><br>    Plaintiff,<br><br> v.<br><br>SQUARE, INC., RANDY GARUTTI, MARY MEEKER, LAWRENCE SUMMERS, DARREN WALKER, JACK DORSEY, DAVID VINIAR, PAUL DEIGHTON, ANNA PATTERSON, ROELOF BOTHA, JAMES MCKELVEY, AMY BROOKS, and SHAWN CARTER,<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Gary Dunlap ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Square, Inc. ("Square" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Square and the Defendants.

## SUMMARY OF THE ACTION

1.      This is an action brought by Plaintiff against Square and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed transaction between Square and Afterpay Limited ("Afterpay") (the "Proposed Transaction").

2.      On August 1, 2021, the Company announced that it had entered into a Scheme Implementation Deed dated August 2, 2021 (the "Merger Agreement") to acquire Afterpay. Pursuant to the terms of the Merger Agreement each share of Afterpay common stock will be converted into the right to receive either: (i) 0.375 shares of Square Class A common stock ("New Square Shares"), or (ii) 0.375 CHESS Depositary Interests ("New Square CDIs") representing ownership interest in shares of Square Class A common stock issued by Square pursuant to a Deed Poll to be executed by Square and Merger Sub in favor of all Afterpay shareholders ("Deed Poll") (the "Merger Consideration").

3.      On October 5, 2021, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Square and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Square shareholders before the vote on the Proposed Transaction or, in the event the Proposed

Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, the owner of Square shares.

9.      Defendant Square is incorporated under the laws of Delaware and has its principal executive offices located at 1455 Market Street, Suite 600, San Francisco, California 94103.  The Company's common stock trades on the New York Stock Exchange under the symbol "SQ."

10.      Defendant Randy Garutti ("Garutti") is and has been a Square director at all times during the relevant time period.

11.      Defendant Mary Meeker ("Meeker") is and has been a Square director at all times during the relevant time period.

12.     Defendant Lawrence Summers ("Summers") is and has been a Square director at all times during the relevant time period.

13.     Defendant Darren Walker ("Walker") is and has been a Square director at all times during the relevant time period.

14.     Defendant Jack Dorsey ("Dorsey") is and has been a the co-founder of the Company, Chairman of the Board, President, and Chief Executive Officer of Square at all times during the relevant time period.

15.     Defendant David Viniar ("Viniar") is and has been a Square director at all times during the relevant time period.

16.     Defendant Paul Deighton ("Deighton") is and has been a Square director at all times during the relevant time period.

17.     Defendant Anna Patterson ("Patterson") is and has been a Square director at all times during the relevant time period.

18.     Defendant Roelof Botha ("Botha") is and has been a Square director at all times during the relevant time period.

19.     Defendant James McKelvey ("McKelvey") is and has been a Square director at all times during the relevant time period.

20.     Defendant Amy Brooks ("Brooks") is and has been a Square director at all times during the relevant time period.

21.     Defendant Shawn Carter ("Carter") is and has been a Square director at all times during the relevant time period.

4

22.     Defendants Garutti, Meeker, Summers, Walker, Dorsey, Viniar Deighton, Patterson, Botha, McKelvey, Brooks, and Carter are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants, along with Defendant Square, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

24.     Square was founded in 2009 to enable businesses (sellers) to accept card payments, an important capability that was previously inaccessible to many businesses. As Square grew, it recognized that sellers need a variety of solutions to thrive and saw how it could apply its strength in technology and innovation to help them. Square has since expanded to provide more than 30 distinct products and services to sellers that help them manage and grow their business. Similarly, with Cash App, Square has built a parallel ecosystem of financial services to help individuals manage their money. That includes ways for individuals to invest in stocks and bitcoin, receive their paycheck, tax return, and direct deposit up to two days early, and use Cash Card, a free, customizable debit card to pay online and in stores. With TIDAL, Square's global music and entertainment platform, Square believes it can provide artists tools to participate in the economy and grow as entrepreneurs. And finally, Square recently announced a fourth business, TBD, focused on building an open developer platform with the goal of making it easy to create non-custodial, permissionless, and decentralized financial services.

### The Company Announces the Proposed Transaction

25.     On August 1, 2021, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

Square, Inc. (NYSE: SQ) and Afterpay Limited (ASX: APT) today announced that they have entered into a Scheme Implementation Deed under which Square has agreed to acquire all of the issued shares in Afterpay by way of a recommended court-approved Scheme of Arrangement. The transaction has an implied value of approximately US$29 billion (A$39 billion) based on the closing price of Square common stock on July 30, 2021, and is expected to be paid in all stock. The acquisition aims to enable the companies to better deliver compelling financial products and services that expand access to more consumers and drive incremental revenue for merchants of all sizes. The closing of the transaction is expected in the first quarter of calendar year 2022, subject to the satisfaction of certain closing conditions outlined below.

"Square and Afterpay have a shared purpose. We built our business to make the financial system more fair, accessible, and inclusive, and Afterpay has built a trusted brand aligned with those principles," said Jack Dorsey, Co-Founder and CEO of Square. "Together, we can better connect our Cash App and Seller ecosystems to deliver even more compelling products and services for merchants and consumers, putting the power back in their hands."

Afterpay, the pioneering global 'buy now, pay later' (BNPL) platform, will accelerate Square's strategic priorities for its Seller and Cash App ecosystems. Square plans to integrate Afterpay into its existing Seller and Cash App business units, enable even the smallest of merchants to offer BNPL at checkout, give Afterpay consumers the ability to manage their installment payments directly in Cash App, and give Cash App customers the ability to discover merchants and BNPL offers directly within the app.

"Buy now, pay later has been a powerful growth tool for sellers globally," said Alyssa Henry, Lead of Square's Seller business. "We are thrilled to not only add this product to our Seller ecosystem, but to do it with a trusted and innovative team."

"The addition of Afterpay to Cash App will strengthen our growing networks of consumers around the world, while supporting consumers with flexible, responsible payment options," said Brian Grassadonia, Lead of Square's Cash App business. "Afterpay will help deepen and reinforce the connections between our Cash App and Seller ecosystems, and accelerate our ability to offer a rich suite of commerce capabilities to Cash App customers."

Afterpay is an industry leader with a best-in-class product and strong cultural alignment with Square. As of June 30, 2021, Afterpay serves more than 16 million consumers and nearly 100,000 merchants globally, including major retailers across key verticals such as fashion, homewares, beauty, sporting goods and more. Afterpay empowers consumers to access the things they want and need, while allowing them to maintain financial wellness and control. Afterpay also assists merchants in growing their businesses by helping to drive repeat

purchases, increase average transaction sizes, and provide their buyers with the ability to pay over time. Afterpay is deeply committed to helping people spend responsibly without incurring service fees for those who pay on time, interest, or revolving debt, and supports consumers in a number of countries across APAC, North America and Europe (including under its Clearpay brand).

"By combining with Square, we will further accelerate our growth in the U.S. and globally, offer access to a new category of in-person merchants, and provide a broader platform of new and valuable capabilities and services to our merchants and consumers. We are fully aligned with Square's purpose and, together, we hope to continue redefining financial wellness and responsible spending for our customers," said Anthony Eisen and Nick Molnar, Afterpay Co-Founders and Co-CEOs. "The transaction marks an important recognition of the Australian technology sector as homegrown innovation continues to be shared more broadly throughout the world. It also provides our shareholders with the opportunity to be a part of future growth of an innovative company aligned with our vision."

For Square, BNPL presents an attractive opportunity supported by shifting consumer preferences away from traditional credit, especially among younger consumers, consistent demand from merchants for new ways to grow their sales, and the global growth in omnichannel commerce. Combined, Square and Afterpay's complementary businesses present an opportunity to drive growth across multiple strategic levers, including:

- **Enhance both the Seller and Cash App ecosystems.** Afterpay's global merchant base will accelerate Square's growth with larger sellers and expansion into new geographies, while helping to drive further acquisition of new Square sellers. Afterpay will expand Cash App's growing product offering, enable customers to manage their repayments, and help customers discover new merchants when the Afterpay App is integrated into Cash App.
- **Bring added value, differentiation, and scale to Afterpay.** Afterpay will benefit from Square's large and growing customer base of more than 70 million annual transacting active Cash App customers and millions of sellers, which will expand Afterpay's reach and growth both online and in-person. Afterpay consumers will receive the benefits of Cash App's financial tools, including money transfer, stock and Bitcoin purchases, Cash Boost, and more.
- **Drive long-term growth with meaningful revenue synergy opportunities.** Square believes Afterpay will be accretive to gross profit growth with a modest decrease in Adjusted EBITDA margins expected in the first year after completion of the transaction. Square sees an opportunity to invest behind Afterpay's strong unit economics as well as attractive growth synergies, including the opportunity to introduce offerings and drive incremental growth for sellers and increased engagement for Cash App customers.

Afterpay's Co-Founders and Co-CEOs will join Square upon completion of the transaction and help lead Afterpay's respective merchant and consumer

businesses, as part of Square's Seller and Cash App ecosystems. Square will appoint one Afterpay director as a member of the Square Board following closing.

\*       \*       \*

**Transaction Terms**

Under the terms of the Scheme Implementation Deed, which has been approved by the members of the Boards of Directors of both Square and Afterpay, Afterpay shareholders will receive a fixed exchange ratio of 0.375 shares of Square Class A common stock for each Afterpay ordinary share they hold on the record date. Square may elect to pay 1% of total consideration in cash.

Square has agreed to establish a secondary listing on the Australian Securities Exchange (ASX) to allow Afterpay shareholders to trade Square shares via CHESS Depositary Interests (CDIs) on the ASX. Afterpay shareholders will be able to elect whether to receive the scheme consideration in NYSE listed Square Class A common stock or CDIs. The CDIs listed on the ASX are expected to be eligible for S&P index inclusion in Australia.

Based on Square's closing price of US$247.26 on July 30, 2021, this represents an implied transaction price of approximately A$126.21 per Afterpay share, a premium of approximately 30.6% to Afterpay's latest closing price of A$96.66. This represents an approximate 21.9% premium over the 10-day volume weighted average Afterpay share price, and an approximate 10.5% premium over the 30-day volume weighted average Afterpay share price, each as of July 30, 2021. Following completion of the transaction, Afterpay shareholders are expected to own approximately 18.5% of the combined company on a fully diluted basis.

The transaction is subject to conditions precedent as is customary for transactions of this nature, including, among other things, receipt of required regulatory approvals and the approval of shareholders of both companies.

**Advisors**

Morgan Stanley & Co. LLC is serving as financial advisor to Square and Wachtell, Lipton, Rosen & Katz and King & Wood Mallesons are serving as its legal advisors. Goldman Sachs and Qatalyst Partners are serving as financial advisors to Afterpay, Highbury Partnership is serving as financial advisor to Afterpay's Board and Gilbert + Tobin and Cravath, Swaine & Moore LLP are serving as Afterpay's legal advisors.

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

26.     On October 5, 2021, the Company authorized the filing of the Proxy Statement with the SEC.  The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

27.     Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### <u>Misrepresentations or Omissions Regarding the Financial Projections</u>

28.     The Proxy Statement contains projections prepared by the Company's and Afterpay's management concerning the Proposed Transaction, but fails to provide material information concerning such.

29.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

30.     In order to make management's projections included in the Registration Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

31.     Specifically, with respect to the Company's projections, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Adjusted EBITDA; and (ii) Unlevered Free Cash Flow.

32.     With respect to Afterpay's projections the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Adjusted EBITDA; and (ii) Levered Free Cash Flow.

33.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.   Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

## Material False and Misleading Statements or Material Misrepresentations or Omissions Regarding the Sales Process

34.     The Proxy Statement contains information concerning the background of the Proposed Transaction, but fails to disclose material information concerning such.

---

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

35.     The Proxy Statement fails to disclose sufficient information concerning the number and nature of all confidentiality agreements entered into between Square and any interested third party during the sales process, as well as whether any agreement contained "don't-ask, don't waive" or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

36.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.

**Material False and Misleading Statements or Material
Misrepresentations or Omissions Regarding Morgan Stanley's Financial Opinion**

37.     The Proxy Statement contains the financial analyses and opinion of Morgan Stanley & Co. LLC ("Morgan Stanley") concerning the Proposed Transaction, but fails to provide material information concerning such.

38.     With respect to Morgan Stanley's *Public Trading Comparables Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each of the companies selected for the analysis.

39.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the levered free cash flows for both Square and Afterpay used in the analyses; (ii) the range of terminal values calculated for each of the projection cases utilized in the analysis; and (iii) the inputs and assumptions underlying Morgan Stanley's use of the discount rates ranging from 8.0% to 10.0% for Afterpay and 10.0% to 12.0% for Square.

40.     With respect to Morgan Stanley's *Precedent Transactions Premia* analysis, the Proxy Statement fails to disclose: (i) the transactions observed; and (ii) the premiums paid in each transaction.

41. With respect to Morgan Stanley's *Equity Research Analysts' Future Price Targets* analysis, the Proxy Statement fails to disclose the price targets observed, as well as the sources thereof.

42. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

43. Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions. Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

46.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

47.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

48.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

49.     The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

50.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

51.     The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

52.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

53.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

55.     The Individual Defendants acted as controlling persons of SQUARE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of SQUARE, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

56.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

58.     In addition, as set forth in the Proxy Statement at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in

drafting and/or gave their input on the content of those descriptions.

59.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

61.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.     Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 20, 2021                           Respectfully submitted,

                                                  By: */s/ Joshua M. Lifshitz*
                                                  Joshua M. Lifshitz
                                                  Email: jml@jlclasslaw.com
                                                  **LIFSHITZ LAW FIRM, P.C.**
                                                  1190 Broadway,
                                                  Hewlett, New York 11557
                                                  Telephone: (516) 493-9780
                                                  Facsimile: (516) 280-7376

                                                  *Attorneys for Plaintiff*